1    **WO**

2

3

4

5

6                  **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9    Glenn Lane Nudelman,                    No. CV-20-08301-PCT-MTL

10                  Plaintiff,               **ORDER**

11   v.

12   Commissioner of Social Security
     Administration,
13
                     Defendant.
14

15          Plaintiff Glenn Lane Nudelman challenges the Social Security Administration's

16   ("SSA") determination that he does not qualify for Disability Insurance Benefits ("DIB")

17   under Title II of the Social Security Act because he is not disabled. Nudelman filed a

18   Complaint with this Court seeking judicial review of that determination. (Doc. 1.) The

19   Court has reviewed the briefs (Docs. 18, 23, 29) and the Administrative Record (Doc. 17,

20   "AR") and now affirms the administrative law judge's ("ALJ") decision (AR at 13–34).

21   **I.      BACKGROUND**

22          On April 6, 2017, Nudelman filed his application for DIB, alleging that he had been

23   disabled since May 31, 2016. (AR at 16, 208.) The Commissioner denied Nudelman's

24   application initially and on reconsideration. (*Id.* at 121–24, 126–29.) Nudelman appeared

25   at a hearing on October 31, 2019 before an ALJ. (*Id.* at 35–93.) On February 5, 2020, the

26   ALJ issued a written decision finding Nudelman not disabled. (*Id.* at 13–34.) Nudelman

27   requested review of his claim and on September 14, 2020, the Appeals Council denied

28   review making the ALJ's decision final and ripe for this Court's review. (*Id.* at 1–6.)

Nudelman now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

After reviewing and considering the medical opinions and records, the ALJ evaluated Nudelman's disability based on the following severe impairments: degenerative disc disease of the cervical and lumbar spines, carpal tunnel syndrome, ulnar neuropathy, and osteoarthritis of the hips. (*Id.* at 19–21.) In making this determination, she reviewed the entire record, including medical records and opinions and statements from Nudelman. (*Id.* at 18–27.) She also evaluated his "medically determinable mental impairment of a depressive disorder" and determined that it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe." (*Id.* at 19; *see id.* at 19–21.) When making the mental health determination, she reviewed the entire record, including medical records and statements from Nudelman, opinion evidence, and "the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1) . . . known as the paragraph B criteria." (*Id.* at 19.) She found that Nudelman "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (*Id.* at 21.)

Next, the ALJ calculated Nudelman's residual functional capacity ("RFC"). She determined that he had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except [he] cannot climb ladders, ropes, or scaffolds. [He] can frequently balance, stoop, kneel, crouch, or crawl." (*Id.* at 21; *see id* at 21–26.) When determining his RFC, she analyzed conflicting medical and opinion evidence. (*Id.* at 21–26.) Nevertheless, she found that the medical record demonstrates functional abilities and behaviors inconsistent with the duration, frequency, and severity of his alleged limitations. (*Id.*) Based on his RFC, she determined that he could perform past relevant work as a physician as generally performed, but not as he claimed he performed it. (*Id.* at 26–27.) Accordingly, she found that he was not disabled during the relevant period. (*Id.* at 27.)

## II.    STANDARD OF REVIEW

In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, but less than a preponderance; it is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* To determine whether substantial evidence supports a decision, the Court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citation omitted). Finally, the Court may not reverse an ALJ's decision on account of an error that is harmless. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006). "The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Molina v. Astrue*, 674 F.3d 1104, 1119 n.11 (9th Cir. 2012) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). "An error is harmless if it is inconsequential to the ultimate nondisability determination, or if the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citations and internal quotation marks omitted).

To determine whether a claimant is disabled, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled, and the inquiry ends. *Id*. At step two, the ALJ determines whether the

claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled, and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. *Id.* At step four, the ALJ assesses the claimant's RFC and determines whether the claimant is still capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled, and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where the ALJ determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

## III.    DISCUSSION

Nudelman raises three arguments. First, he argues that the ALJ failed to properly weigh the medical opinion evidence. (Doc. 18 at 13–22; Doc. 29 at 6–7.) Second, he argues that the ALJ improperly considered his mental and functional limitations when determining his RFC. (Doc. 18 at 3–13; Doc. 29 at 2–6.) Third, he argues that Andrew Saul's appointment constituted a violation of separation of powers. (*See* Doc. 18 at 22–25; Doc. 29 at 8–25.) As a result, he did not legally exercise power as Acting Commissioner. (*See Id.*) Therefore, Nudelman argues, the ALJ's authority is "constitutionally defective" because her power derives from her appointment by Andrew Saul. (Doc. 18 at 22; *see* Doc. 18 at 22–25; Doc. 29 at 8–25.)

### A.    Medical Opinion Evidence

In 2017, the rules for evaluating medical evidence were revised. For claims filed on or after March 27, 2017, the revised rules apply. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01, 2017 WL 168819 (January 18, 2017). Under the revised rules, all evidence an ALJ receives is considered, but the rules create specific articulation requirements regarding how medical opinions and prior administrative

medical findings are considered. 20 C.F.R. §§ 404.1520c(a)–(b), 416.920c(a)–(b). The revised rules do not require an ALJ to defer to or assign every medical opinion a specific evidentiary weight. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ determines the persuasiveness of the piece of evidence's findings based on factors outlined in the regulations. 20 C.F.R. §§ 404.1520c(a)–(b), 416.920c(a)–(b). The most important factors are consistency and supportability, but the regulations list others that may be considered: the treatment relationship, specialization, and whether the source has familiarity with other evidence in the claim or an understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c), 416.920c(a), (c).

Regardless of whether the source is an "accepted medical source[]," the revised rules require ALJs to articulate how they consider medical opinions from all medical sources. 20 C.F.R. §§ 404.1520c, 416.920c ("We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record."). The revised rules also expanded the list of acceptable medical sources to include licensed audiologists, licensed advance practice registered nurses, and licensed physician assistants. *See* 20 C.F.R. §§ 404.1502, 416.902. These articulation requirements do not apply to the consideration of evidence from nonmedical sources. 20 C.F.R. §§ 404.1520c(d), 416.920c(d).

Nudelman argues "the ALJ's finding that any of the Agency or consultative examinations were persuasive is completely inconsistent with her own findings that [he] was limited to light work, had mild limitations in understanding, remembering and applying information, and had impairments that lasted long enough to be disabling." (Doc. 18 at 16.) He goes on to argue that "[t]he ALJ effectively mischaracterized the evidence from the Agency physicians as supporting her conclusions, such that it appeared she had relied on medical opinions, when in fact she relied only on her own lay perception of Mr. Nudelman's limitations in making her RFC finding." (*Id.*) This flawed reasoning, he argues, "rendered the articulation of her findings insufficient to support her conclusion that [he] was not disabled." (*Id.* at 16–17.)

He also argues that many of the ALJ's conclusions are incongruent with the record. (*Id.* at 17–18.) First, he asserts that her conclusion that the "Agency's physical medical opinions were 'partially persuasive'" does not match her findings. (*Id.* at 17.) He highlights the same deviation with her findings regarding his mental impairments. (*Id.*) Because of these irregularities, he argues that she merely stated she relied on the Agency opinions as a pretense without actually doing so. (*Id.*) And so, he asserts, she failed to publish a fair articulation of her conclusions. (*Id.*) Similarly, he argues that the ALJ's findings regarding the consultative examinations was inconsistent with her final decision. (*Id.* at 17–18.)

Nudelman argues that these incongruities exist because the ALJ improperly relied on her own lay opinion rather than the medical opinions in the record—something which "courts in wide-ranging jurisdictions, including the Ninth Circuit, have cautioned ALJs against." (*Id.* at 18.) This is because, he asserts, "[she] simply was not qualified to substitute her judgment for that of qualified medical professionals." (*Id.* at 19.) He argues that she substituted her lay opinion because the record was not fully developed, and, instead of inserting her opinion, she should have sought additional medical opinions to further develop the record. (*Id.* at 19–20.) Failing to do so was error. (*Id.*)

Finally, Nudelman argues that the ALJ failed to develop the record regarding his hearing impairment. (*Id.* at 20.) He argues that "[i]n concluding that his hearing loss was not even a severe impairment, the ALJ relied on her own faulty reasoning and mischaracterized Mr. Nudelman's own testimony." (*Id.* at 20.) He then outlines four ways in which she erred on this issue. (*Id.* at 20–21.) First, she mischaracterized his statements by "incorrectly stat[ing] that he did not wear hearing aids, but" he argues "what he actually said was that he didn't wear them all the time." (*Id.*) Second, he asserts her conclusion is illogical because she "suggested his hearing loss would not impact his work because it had not over the prior ten years; however, she cited specifically to a statement where Mr. Nudelman explained that he could not use a stethoscope with hearing aids." (*Id.* at 21.) These first two points, he argues, establish at least moderate to severe hearing loss and show it affected his work. (*Id.*) Third, he asserts, "the fact that [his] hearing loss did not

seem, to the ALJ, to have impacted his job as he performed it was irrelevant since the ALJ only concluded that he could return to his job as it was performed in the national economy" and "the job of physician requires the ability to hear frequently, from one-third to two-thirds of the workday." (*Id.*) Fourth and finally, he notes that the question of whether his hearing loss had impacted his work in the past was not addressed at the hearing and argues that this notion lacks support in the record. (*Id.*)

The Commissioner argues that the ALJ did properly evaluate the medical opinions when determining Nudelman's functional abilities and that her "findings were based on a reasonable interpretation of the evidence." (Doc. 23 at 7.) The Commissioner begins by asserting that the ALJ reasonably found that the administrative medical findings of Dr. Salk and Dr. Titus were persuasive. (*Id.* at 8.) The Commissioner highlights that Dr. Salk and Dr. Titus found "that [Nudelman] did not have a severe mental impairment" based on their review of the record. (*Id.* at 8; AR at 25–26, 99, 113.) For example, their findings were consistent with his perfect score on a Mini-Mental State Exam. (AR 392.) The Commissioner also argues that Dr. Salk's and Dr. Titus' opinions were consistent with Dr. Patrick's opinion, which found that Nudelman had no mental limitations. (Doc. 23 at 8; AR at 393.) And so, the Commissioner asserts that the ALJ's finding "that [Nudelman] had a non-severe mental impairment that did not require any" RFC limitations was reasonable. (Doc. 23 at 8.)

Next, the Commissioner argues that Nudelman's "argument that the ALJ erred because the State agency consultants did not review the entire record is meritless." (*Id.*) The Commissioner asserts that the ALJ, not physicians, is responsible for evaluating the record and assessing a claimant's functional abilities. (*Id.*) Additionally, the Commissioner argues, "there is no requirement that the State agency medical consultants review the entire record for the ALJ to rely on their opinions." (*Id.*) Instead, the Commissioner argues, "[t]he issue is whether the State agency prior administrative medical findings are supported and consistent with the record." (*Id.* at 9.) And so, the Commissioner asserts that the ALJ here properly evaluated the record and that her conclusion was reasonable. (*Id.*) The

Commissioner also argues that the ALJ reasonably found that Dr. Coleman's and Dr. Bargan's prior administrative medical findings were no more than partially persuasive. (*Id.*; AR at 26, 99, 112.) Finally, the Commissioner asserted that "[Nudelman's] argument that the ALJ mischaracterized her deference to the State agency physicians is meritless" because she properly weighed that evidence after considering the entire record. (Doc. 23 at 10; *see id.*)

After that, the Commissioner argues that the ALJ reasonably considered the opinions of Dr. Patrick and Dr. Bremmer. (*See id.*) The Commissioner asserts that if the ALJ's findings are not in-line with these opinions, it does not mean that the ALJ erred. (*See id.*) Instead, the Commissioner asserts that those opinions were consistent with the evidence in the record at the time, but evidence submitted later pointed to different conclusions. (*Id.*) And that is why, the Commissioner argues, the ALJ did not adopt the opinions despite finding that they were "persuasive to the extent [that] they supported a finding that [Nudelman] had no mental limitations and did not require additional physical limitations in the RFC." (*Id.*) The Commissioner also highlights that Nudelman "has failed to point to probative evidence that shows he is more limited." (*Id.*) And, despite Nudelman's arguments, the Commissioner asserts "the ALJ was not required to further develop the record because it was adequate for the ALJ to make a disability determination." (Doc. 23 at 10; *see* Doc. 23 at 10–11.) The Commissioner also argues that, although Nudelman did not allege a hearing problem as a basis for disability when filing for benefits, the ALJ reasonably evaluated the record regarding Nudelman's hearing impairment claim. (Doc. 23 at 11.)

Finally, the Commissioner argues that the ALJ reasonably found that Dr. Livingstone's and Dr. Kaperonis' opinions were not persuasive. (Doc. 23 at 11–13.) The Commissioner asserts the ALJ reasonably found that Dr. Livingstone's opinion was not persuasive because (1) his findings were not consistent with the record, (2) he did not provide objective testing to support his medical findings, (3) his findings were not consistent with Nudelman's daily activities, and (4) his opinion concluded that Nudelman

was disabled almost 5 years before his alleged onset date. (*Id.* at 11–12.) The Commissioner also argues that the ALJ reasonably found Dr. Kaperonis' opinion was not persuasive because (1) Dr. Kaperonis' opinion was not supported by objective testing, (2) it was inconsistent with the record, and (3) it was inconsistent with Dr. Kaperonis' own treatment notes. (*Id.* at 12–13.) Finally, the Commissioner argues that the ALJ reasonably considered Dr. Livingstone's and Dr. Kaperonis' opinions because, even though their opinions were consistent with each other, they were inconsistent with the rest of the evidence. (*Id.* at 13.)

Nudelman counters that "it is well-settled that an ALJ cannot make her own, lay assessment regarding a claimant's physical condition." (Doc. 29 at 6.) He argues that the difference between the Agency consultant findings, the medical opinions of the persuasive consultative examiners, and the ALJ's ultimate conclusions indicate that the ALJ made her own lay assessment of the record. (*Id.*) For example, he highlights that "the Agency physician consultants and consultative examiners identified no physical or mental limitations" and that the ALJ found these opinions persuasive. (*Id.*) But she "issued a decision with many severe impairments and significant work-related limitations." (*Id.*) He also argues that her rejection of Dr. Livingstone's medical opinion is indicative of "ends-based reasoning." (*Id.* at 7.) Finally, regarding his hearing loss, he asserts that "[t]here is no statutory or case law provision that would preclude a medical condition from consideration in a disability claim just because it was not listed on the initial application." (*Id.*) Instead, he argues, "[t]he ALJ's interpretation of the evidence was based on her own assumptions and a mis-representation of the evidence." (*Id.*)

As more thoroughly addressed below, the ALJ's assessment of the persuasive value of each medical opinion was reasonable. Additionally, the ALJ reasonably interpreted the evidence regarding Nudelman's hearing loss. Therefore, this Court finds that the ALJ's assessment of Nudelman's physical condition was reasonable and not the product of the ALJ inappropriately inserting her own lay opinion.

1            1.      Dr. Livingstone

2          In May 2016, Dr. Livingstone issued an opinion that Nudelman was permanently

3    and totally disabled from his work as a physician. (AR at 24, 343, 988–91.) He renewed

4    this opinion in March 2018 and in August 2018 he completed a form indicating that

5    Nudelman had been disabled since July 2011. (*Id.* at 24–25, 1007–8, 1032.) The ALJ

6    reasonably found that all three of these opinions were not persuasive. These opinions were

7    inconsistent with the findings of other physicians and psychologists who examined

8    Nudelman or his medical records. (*Id.* at 24, 99, 112–13, 393, 401.) Additionally, Dr.

9    Livingstone's opinions, which include that "[Nudelman] is unable to engage in any work,"

10   (*Id.* at 24), are inconsistent with Nudelman's history of travelling, golfing, bicycling, and

11   downhill skiing. (*Id.* 24–25, 341, 380, 1007, 1154.) The ALJ also reasonably noted that

12   "the claim that medications make it unsafe for the claimant to work is undermined by the

13   claimant's ability to function sufficiently well, while on those same medications, to

14   perform activities like skiing." (*Id.* at 25.) What is more, the March 2018 "opinion points

15   to no objective testing that supports its conclusion." (*Id.*) Finally, the ALJ's observation

16   that the August 2018 opinion indicating Nudelman had been disabled since July of 2011

17   contradicts Nudelman's alleged onset date of May 2016 and conclusion that this

18   inconsistency contributes to the opinion being unpersuasive was reasonable. (*Id.* at 25,

19   1032.)

20           2.      Dr. Kaperonis

21          In August 2016, Dr. Kaperonis issued an opinion determining that Nudelman was

22   "totally disabled." (AR at 25, 360, 380.) The ALJ reasonably found that his opinion was

23   unpersuasive because it was inconsistent with the findings of other physicians and

24   psychologists who examined Nudelman or his medical records. (*Id.* at 24, 99, 112–13, 393,

25   401.) Additionally, the ALJ reasonably observed that Dr. Kaperonis' opinion was

26   internally inconsistent with his "own notes which indicate the claimant was alert and

27   oriented, had normal speech, had a normal affect, no hallucinations, no thoughts of harming

28   himself or others, and adequate insight and judgment." (*Id.* at 25; *see id.* at 99, 112–13.)

What is more, Dr. Kaperonis' opinion "points to no compelling evidence, objective testing for example, that would support the claim of total disability." (*Id.* at 25.)

### 3.   Dr. Patrick

In June 2017, Dr. Patrick issued an opinion determining that Nudelman "had no conditions which would impose any limitations for 12 continuous months." (*Id.* at 25; *see id.* at 393.) After reviewing the relevant parts of the record, the ALJ determined that "there [was] scant evidence that the claimant's mental health [had] deteriorated in the years since this examination to the extent that some accommodation would be necessary." (*Id.* at 25.) The ALJ also highlighted that Dr. Patrick's opinion was consistent with the findings of other physicians and psychologists who examined Nudelman's records. (*Id.* at 99, 112–13.) And so, the ALJ reasonably determined that Dr. Patrick's opinion was persuasive.

### 4.   Dr. Bremmer

In August 2017, Dr. Bremmer issued an opinion determining that Nudelman "had no conditions which would impose any limitations for 12 continuous months." (AR at 25; *see id.* at 401.) After reviewing the record, the ALJ found that while Dr. Bremmer's opinion was consistent with his examination of Nudelman, "the record does document" that Nudelman suffered "a degree of impairment supported by records from the subsequent two years." (*Id.* at 25; *see id.* at 1157–60, 1165–66, 1167–70.) Given the conflict between Nudelman's medical record and Bremmer's examination, the ALJ reasonably determined that Dr. Bremmer's opinion was partially persuasive

### 5.   Dr. Salk and Dr. Titus

Dr. Salk and Dr. Titus are State agency psychological consultants who each independently reviewed Nudelman's medical records. In July 2017, Dr. Salk determined that Nudelman did not have a severe mental health impairment. (AR at 25, 99.) In October 2017, Dr. Titus independently reconsidered the record and also concluded that Nudelman did not have a severe mental health impairment. (*Id.* at 25, 113.) After reviewing the record, the ALJ found that these opinions were consistent with Dr. Patrick's opinion and that "there

is scant evidence that the claimant's mental health has deteriorated in the years since this examination to the extent that some accommodation would be necessary." (*Id.* at 25–26; *see id.* at 393.) And so, the ALJ reasonably determined that Dr. Salk's and Dr. Titus' opinions was persuasive.

### 6.    Dr. Coleman and Dr. Bargan

Dr. Coleman and Dr. Bargan are State agency medical consultants who each independently reviewed Nudelman's medical records. In August 2017, Dr. Coleman determined that Nudelman "did not have a severe impairment from any physical condition." (AR at 26.) In October 2017, Dr. Bargan independently reconsidered the record and reached the same conclusion. (AR at 26, 112.) The record demonstrates that Nudelman "has persistent complaints of limited range of motion in his cervical spine, and at times in his lumbar spine and hips." (AR at 25; *see, e.g.*, *id.* at 1101, 1154.) Thus, the ALJ reasonably concluded that "[t]he record . . . support[s] more accommodations than provided for in [those] opinions." (AR at 26.)

### 7.    Nudelman's Hearing Loss

Nudelman alleged an impairment from hearing loss, and the ALJ reasonably determined that his hearing loss is not a severe impairment. (AR at 21.) Although Nudelman claimed that he was unable to use a stethoscope with the hearing aids he needed, the fact that he had had this hearing loss since at least 2010 indicates that "he was able to work with [the] condition, gainfully, for years." (*Id.* at 21; *see id.* at 205, 391, 746, 483.) Additionally, although Nudelman testified that he stopped working, in part, due to his hearing loss, that testimony was weakened by his lengthy testimony that "he stopped work[ing] in large part to get out of his work situation." (*Id.* at 22.) Thus, the ALJ reasonably determined that his hearing loss was not severe. (*Id.* at 21.)

### 8.    The ALJ's Decision is Consistent with the Record

The Court disagrees with Nudelman's deduction that the difference between the Agency consultant findings, the medical opinions of the persuasive consultative examiners, and the ALJ's ultimate conclusions indicate that the ALJ made her own lay assessment of

the record. Instead, the Court finds that the record indicates that the ALJ performed her job as intended. She reasonably weighed the persuasive value of each piece of evidence and made an RFC determination that synthesized the record at hand.

## B.    RFC Determination

In laymen's terms, RFC is what the claimant can do in a work environment in spite of their disabilities or limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations define RFC as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c). "The ALJ assesses a claimant's RFC based on all the relevant evidence in [the] case record," to determine the claimant's capacity for work. *Laborin v. Berryhill*, 867 F.3d 1151, 1153 (9th Cir. 2017) (quotation marks and citation omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ should consider a claimant's ability to meet physical and mental demands, sensory requirements, and other functions. *See* 20 C.F.R. §§ 404.1545(b)–(d), 416.945(b)–(d). "[I]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' The RFC therefore should be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (cleaned up). Additionally,

> The RFC assessment must contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate. In other words, the ALJ must take the claimant's subjective experiences of pain into account when determining the RFC.

*Laborin*, 867 F.3d at 1153 (cleaned up).

"At step four, a claimant has the burden to prove that he cannot perform his past relevant work 'either as actually performed or as generally performed in the national economy.'" *Stacy v. Colvin*, 825 F.3d 563, 569 (9th Cir. 2016) (quoting *Lewis v. Barnhart*,

281 F.3d 1081, 1083 (9th Cir. 2002)). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). An ALJ is free to consider any activities that "may be seen as inconsistent with the presence of a condition which would preclude all work activity." *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990). It is well established that an ALJ is also empowered to note a claimant's daily activities that "'involv[e] the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

A claimant can return to previous work if he or she can perform the "'actual functional demands and job duties of a particular past relevant job'" or "the functional demands and job duties of the past occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (cleaned up).

Nudelman argues that the ALJ "never account[ing] for [his] admittedly severe CTS, ulnar neuropathy, or cervical degenerative disc disease" was error. (Doc. 18 at 11.) He begins by asserting that the ALJ found that "[he] had severe CTS, ulnar neuropathy, and cervical degenerative disc disease." (*Id.* at 12.) And, "[a]s a matter of law, a severe impairment significantly limits a claimant's ability to perform basic work activities." (*Id.* at 11.) And so, he argues, those severe limitations "significantly limit[] [his] ability to perform basic work activities." (*Id.* at 12.) He asserts, "[i]t is impossible to have severe CTS and ulnar neuropathy without any limitations in manipulative ability. Neck and head positioning or manipulative limitations must accompany a severe cervical disorder." (*Id.*) Because his "case was decided . . . at step four" and "[i]t would be nearly impossible for him to effectively perform his job as a physician with any significant impairment in use of his hands or significant limitations in neck movement," he argues the ALJ's RFC determination that he could still work as a physician was in error. (*Id.*; *see id.* at 13.)

- 14 -

The Commissioner argues that the ALJ reasonably calculated Nudelman's RFC. (Doc. 23 at 5–6.) The Commissioner asserts that the ALJ properly considered Nudelman's severe impairments; activities he enjoys, like skiing; and the medical evidence in the record. (*Id.* at 6.) The Commissioner also argues that "the medical evidence was generally unremarkable." (*Id.*) Specifically, the Commissioner highlights that Nudelman "had a reduced range of motion in his cervical spine but normal gait, reflexes and a normal range of motion in his upper and lower extremities including his hands;" had CTS which improved with surgery; and presented the "ability to perform several strenuous activities." (*Id.*) Thus, the Commissioner asserts, the ALJ's RFC assessment that "[Nudelman] could perform light work with additional restrictions on climbing and the frequency of postural activities" and that "support for additional accommodations is not present in the record" was reasonable. (*Id.* at 6; AR at 23.)

Nudelman counters that the Commissioner's arguments are irrelevant. He contends that "[b]ecause the ALJ found [his carpal tunnel syndrome, ulnar neuropathy, and cervical degenerative disc disease] to be severe, it is undeniable that those impairments were significantly impacting [his] working ability." (Doc. 29 at 5.) And so, he maintains that "remand must occur for an RFC finding that reflects all of [his] severe impairments." (*Id.* at 6.)

As a threshold matter, despite Nudelman's arguments to the contrary, it is well established that "[a] severe impairment need not necessarily correspond to limitations on a claimant's ability to perform basic work activities . . . ." *Thomas v. Comm'r of Soc. Sec. Admin.*, 480 F. App'x 462, 463 (9th Cir. 2012) (cleaned up). Given the medical evidence, the ALJ reasonably determined that Nudelman's disability limited him to light work with the additional restriction that he cannot climb ladders, ropes, or scaffolds and the clarification that he can frequently balance, stoop, kneel, crouch, or crawl.[1] (AR at 21;

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

*see id.* at 21–26.) As the ALJ's opinion outlines, she properly considered the medical evidence in the record after appropriately weighing the evidence before determining Nudelman's RFC. (*See id.* at 21–26.) The ALJ achieved this through not only an extensive discussion of the medical record, but also by personalizing his RFC. (*Id.*) As previously noted, the ALJ included a restriction on climbing, but made sure to explicitly allow balancing, stooping, kneeling, crouching, and crawling in Nudelman's RFC. (*Id.*)

The care the ALJ took when deciding this case is clear from the in-depth analysis of Nudelman's claim. For example, she documents his extensive medical history. (*Id.* at 22–23.) In doing so, she reasonably determined that some medical opinions were more persuasive than others. (*See id.* at 21–26.) Specifically, the ALJ found that Ms. Yamamoto's, Dr. Livingstone's and Dr. Kaperonis' medical opinions were not persuasive and found that Dr. Patrick's, Dr. Salk's, Dr. Titus', Dr. Coleman's, Dr. Bargan's, and Dr. Bremmer's opinions were persuasive or partially persuasive. (*See id.* at 24–26.) She also considered his lifestyle choices and activities when making her RFC determination. (*See id.* at 21–26.) Additionally, she reasonably concluded that "[s]upport for additional accommodations is not present in the record; the claimant continues to engage in strenuous activities such as golf, bicycling, and downhill skiing and the need to take pain medication to participate does not undermine support for a finding the claimant can perform the much less strenuous demands of light work." (*Id.* at 23.) Finally, she observed that, although he suffered from carpal tunnel syndrome, that was improved with surgery and no accommodation was necessary. (*Id.*) Thus, her RFC determination was reasonable.

## C. Mental Impairment

When evaluating mental impairment severity, the ALJ must follow a two-step procedure. *See* 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The first step requires evaluating

---

To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [claimant has] a medically determinable mental impairment[]." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). In doing so, the ALJ must also "specify the symptoms, signs, and laboratory findings that substantiate the presence of [each determined] impairment and document [the] findings . . . ." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).

The second step involves the ALJ rating "the degree of functional limitation resulting from [claimant's] impairment." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). This process varies case-by-case. For every claimant, the ALJ must consider every piece of relevant evidence and determine the degree to which the claimant's "ability to function independently, appropriately, effectively, and on a sustained basis" is hindered by his or her mental impairment. 20 C.F.R. §§ 404.1520a(c), 416.920a(c). The ALJ does this by rating the claimant's degree of functional limitation in four areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* The rating system is based on a five-point scale: "None, mild, moderate, marked, and extreme." *Id.* Beyond this determination, an "ALJ [is] not required to make any more specific findings of the claimant's functional limitations." *Hoopai v. Astrue*, 499 F.3d 1071, 1077–78 (9th Cir. 2007). Next, the ALJ determines the severity of the mental impairment. *See* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). During this process, to explain and record his or her administrative review, an ALJ must provide the proper documentation including a standard document accounting how the technique was applied. *See* 20 C.F.R. §§ 404.1520a(e), 416.920a(e). Later reviews by written decision must also "document application of the technique." *See id.*

Nudelman argues that the RFC determination "must include all of the limitations the ALJ has found to be supported by the evidence of record, whether from severe impairments or non-severe impairments." (Doc. 18 at 3.) He argues that because she "found that [he] had at least mild limitations in his ability to understand, remember, and apply information," which are "not negligible or non-existent," and did not "[identify] limitations

in mental functioning in her decision[;] the ALJ indisputably failed to accommodate any mental limitations she found credible in the RFC finding." (*Id.* at 4–6.) This is because, he asserts, "no limitation in the RFC finding reflected the mild limitations the ALJ concluded [he] was experiencing." (*Id.* at 6.) He continues by arguing that "all limitations found credible by the ALJ must be incorporated into the RFC in some form." (*Id.* at 6.)

Citing *Solomon v. Commissioner of Social Security*, 376 F.Supp.3d 1012 (D. Ariz. 2019), he argues that this is not harmless error as "[t]he omission of mild mental functional limitations is absolute legal error when the issue involves performing skilled work." (*Id.* at 7.) And, in this case, "[her] decision depended upon [his] ability to perform his skilled past relevant work." (*Id.* at 7.) He asserts that reconciling how he could perform his past relevant skilled work given the mental limitations she found was not attempted or addressed in her opinion. (*Id.* at 8.) He also argues that the ALJ failed to explain how he could "[perform] the job of a physician as defined in the DOT" given his mild impairment. (*Id* at 8; *see id.* at 8–10.) Finally, he asserts that she erred by failing to perform a "function-by-function analysis at step four" when determining his RFC. (*Id.* at 11.)

The Commissioner argues that "[t]he ALJ was not required to include mental limitations for Plaintiff's non-severe mental impairment" and that this determination was a reasonable interpretation of the record. (Doc. 23 at 2; *see id.* at 2–3.) The Commissioner asserts that, after reviewing the record, the ALJ reasonably determined that Nudelman's depression did not significantly limit his ability to work. (*Id.* at 3.) The Commissioner highlights that the other mental health findings the ALJ made were also consistent with her determination. (*See id.* at 3–4.) The Commissioner also argues that the ALJ's decision was consistent with Dr. Patrick's, Dr. Salk's, and Dr. Titus' opinions. (*See id.* at 4.) And so, the Commissioner explains, "[b]ecause the ALJ considered the limiting effects of Plaintiff's impairment and properly found that his mental limitations were minimal, she was not required to include them in the RFC." (*Id.* at 4.) The Commissioner also asserts that the ALJ did not err by omitting mild mental limitations when Nudelman's past skilled work was at issue because, "[u]nlike in *Solomon*, the ALJ [reasonably] considered Plaintiff's

mental impairment at step four" and "the record showed generally unremarkable findings including good memory and concentration." (*Id.*; *id.* at 5; *see id.* at 4–5.) Finally, the Commissioner argues that the ALJ reasonably concluded that Nudelman's mild limitation in understanding, remembering or applying information "did not cause even a minimal loss of work-related function." (*Id.* at 5.) Therefore, the Commissioner concludes, it was reasonable for the ALJ to determine that Nudelman could perform his past work. (*Id.*)

Nudelman counters that "there was no explanation from the ALJ regarding her decision to exclude the proven limitations from Dr. Nudelman's non-severe mental impairment." (Doc. 29 at 2; *see id.*) He also asserts that her explanation for why she did not include a mental function limitation in the RFC finding was insufficient boilerplate language. (*See id.* at 3–4.) Citing *Solomon*, he argues that "fail[ing] to include mental limitations in an RFC finding despite finding mild limitations at step three" is legal error. (*Id.* at 4; *see id.*) He argues this is particularly concerning in this case because his former career as a physician is skilled work. (*See id.* at 4–5.)

*Solomon* concerned a 66-year-old man previously worked as a civil engineer. 376 F.Supp.3d at 1015. He applied for disability benefits and an ALJ denied his application. *Id.* He then appealed the ALJ decision to the District of Arizona. *Id.* at 1016. The court held that the ALJ erred by failing to consider his mental limitations when calculating his RFC in step 4 and omitting his mental limitations from the hypotheticals the ALJ posed to a vocational expert. *Id.* at 1020–1021. Thus, the court held that while an ALJ is not required to include mental limitations for non-severe mental impairments, they must be considered at step 4. *See id.*

This case presents an unusual situation. From the briefs, it is clear that the parties agree that the ALJ performed both steps accurately, they only disagree over her formulation of Nudelman's RFC. (*See generally*, Docs. 18, 23, 29.) Nudelman's argument that "all limitations found credible by the ALJ must be incorporated into the RFC in some form" is without merit. (Doc. 18 at 6.) *See Solomon*, 376 F.Supp.3d at 1020–21. What is more, there is sufficient evidence to support the ALJ's decision regarding the exclusion of any mental

limitation accommodations. Her conclusion to refrain from adding a mental impairment accommodation is consistent with Dr. Patrick's, Dr. Salk's, and Dr. Titus' opinions. (*See* AR at 99, 113, 393.) Her conclusion was also consistent with much of the record. (*See* AR at 19-20). Finally, she, unlike the ALJ in *Solomon*, did consider Nudelman's mild mental impairment and reasonably determined that "there is insufficient support for a finding that the claimant experiences even a minimal loss of work-related function from those conditions." (AR at 27; *see* AR at 26–27.) Additionally, in contrast to *Solomon*, the ALJ's hypotheticals posed to the vocational expert properly considered Nudelman's mental limitations. (AR at 27, 75–92.) Thus, the ALJ's RFC determination was reasonable and will be affirmed.

### D.    Separation of Powers

Relying on *Seila Law LLC v. Consumer Financial Protection Bureau*, --- U.S. ---, 140 S. Ct. 2183 (2020), Nudelman argues that "the appointment of a single commissioner of the social security administration who is removable only for cause and serves a longer term than the president" under 42 U.S.C. § 902(a)(3)'s removal restriction "violates separation of powers." (Doc. 18 at 22.) He argues that the SSA's structure is unconstitutional and leads to an ALJ with an illegitimate delegation of authority deciding his case based on regulations that are illegitimately promulgated. (*Id.* at 22–23.) Thus, he asserts that the United States deprived him of a valid administrative adjudicatory process. (*See id.*) He also argues that, given the ruling in *Carr v. Saul*, --- U.S. ---, 141 S. Ct. 1352 (2021), the SSA cannot argue he has forfeited his constitutional challenges by not raising them before the SSA. (Doc. 18 at 23.) Additionally, he asserts that if the Government opposes his arguments, then it needs to explain its change in position regarding the constitutionality of the SSA's structure. (*See id.* at 23–24.) Finally, he argues that the Government could have easily avoided this constitutional issue "if Mr. Saul had simply stepped down in the wake of" new Supreme Court jurisprudence. (*Id.* at 24; *see id.* at 24–25.) Therefore, as in *Lucia v. Securities and Exchange Commission*, --- U.S. ---, 138 S. Ct. 2044, 2055 (2018), he argues "[t]his case should be remanded for a *de novo* hearing before

a new ALJ who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so." (Doc. 18 at 25.)

The Commissioner argues that while the Parties agree that § 902(a)(3) violates separation of powers, "without more, that conclusion does not support setting aside an unfavorable SSA disability benefits determination." (Doc. 23 at 14; *see id* at 13–14.) The Commissioner asserts that, under *Collins v. Yellen*, --- U.S. ---, 141 S. Ct. 1761 (2021), "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." (*Id.* at 14.) Quoting from *Collins*, the Commissioner also argues that this case is similar to *Collins* in that "the relevant agency officials were 'properly appointed' pursuant to a statute that exhibited 'no constitutional defect in the . . . method of appointment[.]'" (*Id.* at 15.) Thus, the Commissioner asserts, because Nudelman has not shown that § 902(a)(3) has caused him any compensable harm, the SSA's actions in this case were legitimate and Nudelman cannot receive a new hearing. (*See id.*)

The Commissioner argues that § 902(a)(3) does not apply because the ALJ who adjudicated Nudelman's case was appointed by an Acting Commissioner. An Acting Commissioner, the Commissioner asserts, is an at-will employee who serves at the behest of the President. (*See id.* at 14–17.) And so, the Commissioner asserts that there is no nexus between the harm Nudelman alleges, an illegitimate administrative adjudication, and § 902(a)(3). (*See id.* at 15–17.) Thus, the Commissioner argues, Nudelman cannot receive a new hearing. (*See id.*)

Even if § 902(a)(3) applied to an Acting Commissioner, the Commissioner argues that Nudelman's claim still fails because he cannot show that § 902(a)(3) inflicts compensable harm on him. (*Id.* at 17.) Under *Collins*, the Commissioner asserts that the ALJ's actions are not voided because Nudelman has failed to show that § 902(a)(3) has caused a denial of his benefits. (*See id.* at 17–18.) This is clear, the Commissioner argues, because Nudelman has not and cannot show "how the President's supposed inability to remove the Commissioner without cause might possibly have affected any ALJ's disability

benefits decision, much less the decision on Plaintiff's specific claim.[2]" (*Id.* at 18; *see id.* at 18–19.)

Nudelman counters that whether an ALJ was appointed by a Commissioner or an Acting Commissioner of the SSA is irrelevant because § 902(a)(3) applies broadly to "[a]n individual serving in the Office of Commissioner," including an Acting Commissioner of the SSA, making the Acting Commissioner's tenure unconstitutional. (*See* Doc. 29 at 8–11.) What is more, he argues that the Commissioner's arguments against remand on this point fail because his challenge regards the delegation of authority from the Acting Commissioner to the ALJ and Appeals Council. (*See id.* at 14–15.) He asserts that the removal statute is unconstitutional and establishes that the Acting Commissioner's power is unconstitutionally grounded. (*See id.*) As a result, the delegation of that authority to the ALJ and Appeals Council is also tainted. (*See id.*)

Nudelman next argues that causation and harm should be presumed in his case. (*Id.* at 16–17.) He asserts that applying *Collins* is a mistake here because this case involves "government actors exercising power which those government actors did not lawfully possess." (*Id.* at 16.) "Specifically," he argues "neither the ALJ nor the Appeals Council here had a lawful delegation of authority under which to adjudicate and decide this disability claim." (*Id.*) Thus, he asserts, *Collins* supports the argument that harm and causation should be presumed in this case. (*See id.* at 16–17.)

Finally, Nudelman argues that "[e]ven if a causal connection . . . [was] required . . . [he] has . . . satisfied that requirement." (*Id.* at 18.) He asserts that causation exists here because but for "the unlawful delegation of authority to this ALJ and the Appeals Council judges," his injuries would have never happened because they "were only able to adjudicate and decide [his case] based [on] their constitutionally unsound delegation

---

[2] The Commissioner makes other arguments in support of affirming the ALJ's decision and Nudelman responds to these additional arguments. (*Id.* at 20–24.) But the Court does not address them because they are not necessary for the Court's decision regarding whether the ALJ's decision violates the separation of powers.

of authority from Mr. Saul."[3] (*Id.*)

In *Seila Law*, the Supreme Court decided the question of whether the Dodd-Frank Act conferred unconstitutional removal protection to the Director of the Consumer Financial Protection Bureau.[4] 140 S. Ct. at 2191–95. The Court held that for-cause restrictions on the President's ability to remove the Director of an agency "led by a single Director and vested with significant executive power" infringes on the President's Article II power to remove executive officers at will.[5] *Id.* at 2201; *see id.* at 2197. The Court also concluded that the offending provision was severable from the remainder of the statute and remanded for a factual determination of whether the challenged act had been ratified by an Acting Director who was unprotected from the unconstitutional for-cause removal restriction. *Id.* at 2210–11.

Securities and Exchange Commission ("SEC") ALJs are considered "Officers of the United States" within the meaning of the Appointments Clause, as they exercise "significant authority" and discretion. *See Lucia*, 138 S. Ct. at 2052–53. *Lucia* involved a challenge to the authority of the ALJs of the SEC under the Appointments Clause.[6] *See id.* at 2049–51. The ALJ in *Lucia* was not appropriately appointed because the ALJ was appointed by SEC staff members rather than the Commission itself, a Court of Law, or the

---

[3] Nudelman defines his constitutional injuries in this case as the fact that (1) he did not receive "a constitutionally valid hearing and adjudication" from a validly appointed ALJ, (2) "he did not receive a constitutionally valid decision from an ALJ to which he was entitled," (3) "he received an unfavorable decision from this constitutionally illicit ALJ adjudication process," (4) "he did not receive a constitutionally valid adjudication process from SSA's Appeals Council to which he was entitled," (5) "he did not receive a constitutionally valid determination by the Appeals Council to which he was entitled," and (6) "he received an unfavorable determination from this constitutionally illicit Appeals Council adjudication process." (Doc. 29 at 11–12.)

[4] The Dodd-Frank Act limited the President's ability to remove the Director to instances of "inefficiency, neglect, or malfeasance." *Id.* at 2191.

[5] The Court recognized limited exceptions set forth in precedent. *Id.* at 2192.

[6] Under the Appointments Clause, the President alone commands the power to appoint "Officers of the United States," except that "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

- 23 -

President. *Id.* at 2050. The Court determined that this was a constitutional error and remanded for a new hearing before a properly appointed ALJ or the Commission itself "[t]o cure the constitutional error." *Id.* at 2055; *see id.* at 2049–56.

In *Collins*, the Supreme Court considered a shareholder suit challenging the Constitutionality of certain acts undertaken by the Federal Housing Finance Agency ("FHFA") as conservator for Fannie Mae and Freddie Mac—two federally-chartered mortgage financing companies—in the wake of the 2008 housing crisis. 141 S. Ct. at 1770–76. The Court held that while the Housing and Economic Recovery Act's for-cause removal provision insulated the FHFA's Director from at-will termination by the President in violation of Article II, "there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the [challenged law] as void." *Id.* at 1787. The Supreme Court distinguished the facts of *Collins* from those of *Lucia*, which "involved a Government actor's exercise of power that the actor did not lawfully possess." *Id*. at 1788 (citation omitted). The Court found no basis to conclude "that any head of the FHFA lacked the authority to carry out the functions of the office." *Id*. at 1788. The Court further explained, "[s]ettled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the [challenged act.]" *Id*. at 1788 n. 23. (citing *Seila Law*, 140 S. Ct., at 2207–2211.)

As the *Collins* Court's discussion of *Lucia* makes clear, the ALJ's decision is only per se unconstitutional if he lacked the authority to make it—for example, if he was not properly appointed under the Appointments Clause. *Id.* at 1788; *Lucia*, 138 S. Ct. at 2055 ("This Court has also held that the appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official.") (cleaned up). Unconstitutional for-cause removal challenges alone, however, will not automatically serve to invalidate the ALJ's decision. *See Collins*, 141 S. Ct. at 1788–89. The unconstitutional provision must have caused "compensable harm." *See Collins*, 141 S. Ct.

at 1789. As the majority explained in *Collins*, while *Seila Law* was "all but dispositive" on the removal question, it does not dictate that the Court should invalidate as unconstitutional the challenged decision or act.[7] *Collins*, 141 S. Ct. at 1783.

The Court disagrees with Nudelman's argument that the removal statute establishes that the Acting Commissioner's power is unconstitutionally grounded such that the delegation of that authority to the ALJ and Appeals Council is also tainted. To begin, the constitutionality of the removal statute is not at issue here because the Court does not need to decide whether the statute is constitutional. Regardless of the statute's constitutionality, Nudelman's argument fails. If the statute is constitutional, Nudelman's argument clearly fails because that is the initial premise of his argument.

If the statute is unconstitutional, Nudelman's argument still fails. As explained in *Collins*, an unconstitutional removal provision alone does not imply the Commissioner, and by extension the ALJ, "lacked the authority to carry out the functions of the office." *Collins*, 141 S. Ct. at 1788. Thus, unconstitutional for-cause removal provisions do not automatically invalidate the ALJ's decision. *See id.* at 1788–89.

The provision must be unconstitutional and must have caused "compensable harm" to Nudelman. *See id.* at 1789. Nudelman's argument that there exists a but-for causal chain linking his denial of benefits and § 902(a)(3) is insufficient. There is no immediately apparent connection between the ALJ denying Nudelman's claims and § 902(a)(3). The ALJ's opinion was well-reasoned, contained no harmful legal error, considered the entire record, and was supported by the record. Beyond arguing a constitutional taint flowing

---

[7] Importantly, the *Collins* court explained the difference between what is sufficient to show standing and what is sufficient to show entitlement to relief: "What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction. We held that a plaintiff that challenges a statutory restriction on the President's power to remove an executive officer can establish standing by showing that it was harmed by an action that was taken by such an officer and that the plaintiff alleges was void. But that holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone." *Collins*, 141 S. Ct. at 1788 n. 24 (internal citations omitted).

from § 902(a)(3), Nudelman fails to point out which, if any, defective regulations were promulgated in this case, how they applied to his claim, and how they affected the outcome such that he suffered a compensable harm. While it is conceivable that this constitutional defect could cause compensable harm, Plaintiff has not shown that connection. A broadly construed but-for causal chain is insufficient. For this reason, the Court declines to opine on whether § 902(a)(3)'s protection applies to an Acting Commissioner of the SSA because even if § 902(a)(3) applies, there is simply no evidence of any harm, let alone compensable harm, inflicted in in this case by § 902(a)(3).

**IV.   CONCLUSION**

Accordingly,

**IT IS ORDERED affirming** the February 5, 2020 ALJ decision (AR at 13–34).

**IT IS FURTHER ORDERED** directing the Clerk to enter final judgment consistent with this Order and close this case.

Dated this 11th day of January, 2022.

Michael T. Liburdi
United States District Judge